<u>NOT FOR PUBLICATION</u>                                      [Docket No. 126]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BAYER CROPSCIENCE AG and BAYER
S.A.S.,

              Plaintiffs,                         Civil No. 12-256 RMB/JS

    v.

DOW AGROSCIENCES LLC,                                OPINION

              Defendant.

**APPEARANCES:**

Frederick L. Cottrell, III
Jeffrey L. Moyer
Travis Steven Hunter
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

Robert J. Koch
Christopher Gaspar
Stephanie R. Amoroso
Edwards J. Mayle
Ronald Sigworth
Milbank, Tweed, Hadley & McCoy LLP
1850 K Street NW, Suite 1100
Washington, D.C. 20006

Jennifer L. Dering
Archer & Greiner, P.C.
300 Delaware Avenue, Suite 1370
Wilmington, DE 19801

Anne Shea Gaza
Young, Conaway, Stargatt & Taylor LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801

     Attorneys for Plaintiffs

Steven J. Balick
Lauren E. Maguire
Andrew C. Mayo
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899

Peter A. Bicks
Alex V. Chachkes
Joseph A. Sherinsky
James L. Stengel
Ilene Abala
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, New York 10019

     Attorneys for Defendant Dow AgroSciences LLC

**BUMB**, United States District Judge (sitting by designation):

Plaintiffs Bayer CropScience AG and Bayer S.A.S. ("Plaintiffs" or "Bayer") have sued Defendant Dow AgroSciences LLC ("Defendant" or "Dow") for patent infringement based on Defendant's Enlist E3 ("E3") product. Defendant has moved for summary judgment, arguing that it does not infringe because it obtained a valid sublicense to develop and sell E3. Because this Court agrees that Defendant has a valid sublicense to develop and sell E3, Defendant's motion for summary judgment is GRANTED.

I.   Background

In 2003, Bayer made the decision to divest itself of certain soybean assets. [Docket No. 127 at Ex. A, Transcript of Deposition of David G. Morgan ("Morgan Dep.") at 33:22-35:24]. Consistent with that decision, in 2004, Bayer entered into a series of agreements with two companies - Stine Seed Farm, Inc. ("Stine") and MS Technologies, LLC ("MS Tech") - under which Stine and MS Tech obtained certain assets and licenses for soybean technology. Two of those agreements are central to the instant dispute.

First, Bayer entered into an agreement with Stine (the "Stine Agreement"), under which Stine was granted a nonexclusive license to "increase, market, distribute for sale, sell and offer for sale" soybean seeds containing "events" already made by Bayer, or new events made by or for MS Tech. [Docket No. 161 at Ex. B]. An "event" is a plant cell that has had a new gene introduced into it. [Docket No. 127, Defendant's Brief in Support of Summary Judgment at 3 (citing to record)]. The introduction of a new gene can confer new features on the plant. [Id.]. The introduction of multiple genes is referred to as a "stack." [Id.]. Under Article 2.1.3 of the Stine Agreement, MS Tech gave its consent to this arrangement. [Docket No. 161 at Ex. B].

On the same day, Bayer and MS Tech entered into an agreement titled the "Acquisition Agreement of Certain Soybean Assets of Bayer CropScience S.A. and License Agreement" (the "Agreement"). [Docket No. 127 at Ex. C].  There are a number of relevant provisions in the Agreement, which this Court sets forth below (the most relevant section of the Agreement, Article 3.1.2, is set out in bold):

(1)    the Agreement's preamble indicates that Bayer had "decided to divest" itself of certain soybean assets and license them (Agreement at 3);

(2)    the Agreement's preamble indicates that "some rights . . . will be granted to Stine and will . . . be carved out from" the Agreement (Agreement at 4);

(3)    the Agreement defines "ASSET" as "the BAYER SOYBEAN EVENTS, LEGAL ASSETS and MATERIAL" (Id.);

(4)    the Agreement defines "EXPOLIT" or "EXPLOITATION" as "to make, breed, produce, condition, market, offer, sell, import, export, stock, use, or otherwise dispose of (or offer to do or have done any or all of the foregoing)" (Agreement at 5);

(5)    the Agreement defines "BAYER SOYBEAN EVENT" as certain soybean events already made by Bayer (Agreement at 4);

(6)    the Agreement defines "M.S. SOYBEAN EVENT" as certain soybean events made, by or for, MS Tech (Agreement at 7);

(7)    Article 2.1.1 of the Agreement provides that:

"Subject to the terms and conditions set forth in this AGREEMENT, the Seller hereby sells, transfers and/or assigns the ASSET to [MS TECH], who purchases the ASSET as of the CLOSING with all rights to EXPLOIT the ASSET that the SELLER owns or controls and can sell, transfer or assign."

(8)    Article 3.1.1 of the Agreement provides that:

4

"[Bayer] hereby grants to [MS Tech] solely with regard to SOYBEAN a worldwide, fully paid-up, exclusive license – with the right to grant sublicenses solely as set out in Article 3.1.3 and with the sole exception of the rights to increase, market, distribute for sale, sell and offer for sale, granted to STINE – under the LICENSED PATENTS solely to EXPLOIT the BAYER SOYBEAN EVENTS;

(9)   Article 3.1.2 of the Agreement provides that:

**[Bayer] hereby grants to [MS Tech] solely with regard to SOYBEAN a worldwide, fully paid-up, exclusive license – with the right to grant sublicenses solely as set out in Article 3.1.3 and with the exception of the rights to increase, market, distribute for sale, sell and offer for sale, granted to STINE by separate agreement – under the LICENSED PATENTS in the field of GLYPHOSATE TOLERANT SOYBEAN solely to EXPLOIT GLYPHOSATE TOLERANCE GENES in M.S. SOYBEAN EVENTS;**

(10)  Article 3.1.3 of the Agreement provides that:

The license described in Article 3.1.1. and Article 3.1.2. shall include the rights to sublicense the BAYER SOYBEAN EVENTS and the M.S. SOYBEAN EVENTS, excluding however any right to grant bare sublicenses to any of the LICENSED PATENTS or to the OTP, DMMG, HISTONE PROMOTER, HISTONE INTRON, HISTONE TERMINATOR or the GLYPHOSATE TOLERANCE GENES. For the avoidance of doubt, no license is granted with respect to OTP, HISTONE PROMOTER, HISTONE INTRON, HISTONE TERMINATOR when not used in GLYPHOSATE TOLERANCE GENES.

(11)  Articles 9.1.2 of the Agreement provides for MS Tech to indemnify Bayer for any exploitation by MS Tech, its affiliates, or authorized sublicensees;

(12)  Article 11.3 of the Agreement allows MS Tech to disclose confidential business information as necessary to exploit the assets at issue;

    (13) Under Article 12.1 of the Agreement, the Agreement is
         to be interpreted under English law; and

    (14) Exhibit 3.1.5 of the Agreement provides for certain
         fees to be paid by MS Tech to Bayer in the event MS
         Tech, or its affiliates, subsidiaries, or successors,
         either directly or indirectly commercializes Bayer
         Soybean Events (Agreement at Ex. 3.1.5 at 2).

In addition to the plain language of the Agreement, material to this Court's holding is the following underlined undisputed record evidence: (1) the "carve out" of rights in the MS Tech Agreement was done at Stine's and MS Tech's insistence because Stine could not take on the rights to certain underlying assets without triggering undesired obligations to a third party — the Monsanto Company[1]; (2) with respect to Stine and MS Tech, the purpose of the carve out was to limit Stine's rights, not the rights of MS Tech[2]; (3) it was immaterial to Bayer how any assets were divided

---

[1]    [Docket No. 127 at Ex. B, Transcript of Deposition of Harry Stine ("Stine Dep.") at 36:12-36:16 (Harry Stine, an officer of Stine and manager of MS Tech, testifying that the split of rights was done at Stine's direction); Docket No. 127 at Ex. F, Transcript of Deposition of Joseph Saluri ("Saluri Dep.") at 57:12-58:10 (MS Tech's corporate counsel testifying that the rights split was made at his suggestion); Docket No. 127 at Ex. I, Transcript of Deposition of Justice Edward Mansfield ("Mansfield Dep.") at 26:16-27:3 (MS Tech's then outside counsel testifying that it was important that certain soybean assets went to MS Tech and not Stine because of contractual obligations Stine had); Mansfield Dep. at 66:11-67:4)(testifying as to Monsanto issue)].

[2]    Stine Dep. at 30:3-33:7 (testifying that the business model of MS Tech included direct commercialization and neither Stine, nor MS Tech, contemplated MS Tech being limited to doing business with Stine); Stine Dep. at 36:12-37:17)(testifying that the split of rights was to limit Stine's rights, not to limit MS Tech's);

between Stine and MS Tech because Bayer intended to divest

itself of the assets at issue.[3]

Beginning in 2007, MS Tech and Dow entered into a series of

agreements to cooperatively develop and sell E3 – a triple stack

soybean event that confers tolerance in soybeans to three

different herbicides.  [Docket No. 127 at Exs. Q, R, S].  As

part of those agreements, Dow was granted a sublicense under the

Agreement.  [Id.].  As discussed in more detail below, the

undisputed facts demonstrate that MS Tech retains ownership of

E3.  [Docket No. 129, Declaration of Juan Carlos Rojas ¶ 3].

Similarly, the factual record demonstrates that because MS Tech

retains ownership of E3, E3 is made "for" MS Tech. [Docket No.

127 at Ex. N, Transcript of Deposition of Thomas Schulte, Ph.D.

---

Mansfield Dep. at 45:15-46:23 (testifying that MS Tech was to
receive full bundle of rights and Stine would receive more
limited bundle); Saluri Dep. at 41:22-43:3 (testifying that it
was "ridiculous" to view the Agreement as a limitation on MS
Tech's rights).

[3]    Morgan Dep. at 75:7-76:16 (David G. Morgan, a senior official at
Bayer, testifying that he told Harry Stine that Bayer wished to
divest itself of its soybean assets); Stine Dep. at 15:6-15:19
(testifying that Bayer informed him that it intended to "divest
all corn and soybean assets and get out of those crops."); Stine
Dep. at 49:18-20 (testifying that he understood Bayer was getting
out of the Soybean business); Mansfield Dep. at 143:21-145:19
(Mansfield testifying that Bayer "did not care what we did on our
side as between Stine and MS Tech"); Saluri Dep. at 51:10-
52:3)(testifying that it was immaterial to Bayer what MS Tech did
with its assets because Bayer was exiting the business); [Docket
No. 127 at Ex. G, Transcript of Deposition of Margaret Keating at
97:7-24 (Bayer's in-house counsel testifying that Bayer did not
care as to how assets were divided up between MS Tech and Stine).

(Bayer's 30(b)(6) witness) at 140:9-15; Keating Dep. at 131:10-132:14; Stine Dep. at 40:14-42:4; Saluri Dep. at 48:7-49:2].

Defendant has moved for summary judgment, arguing that it is operating under a valid sublicense from MS Tech.  On June 13, 2013 and June 14, 2013, this Court heard oral argument on Defendant's motion and also heard live testimony on English law, the law governing the Agreement, from English law experts – Professor Edwin Peel and Lord Collins of Mapesbury.

Plaintiffs maintain that, notwithstanding Dow's purported license, Dow's work with E3 is infringing their intellectual property.  They make two arguments:  First, they argue that MS Tech was not granted the right to commercialize under the Agreement and, therefore, MS Tech could not have sublicensed commercialization rights to Dow.  Second, they argue that MS Tech only has the right to sublicense M.S. Soybean Events and that E3 is not an M.S. Soybean Event and, thus, Dow does not have a valid sublicense.


II.  Standard

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." Id.  When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence: all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 252.  Further, a court does not have to adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 373, 380 (2007).  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).  The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatte v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995); Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010)(citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not defeat summary judgment.").

III. Analysis

The parties agree that, if Dow is operating under a valid sublicense, then Dow is entitled to summary judgment.  Radar Indus., Inc. v. Cleveland Die & Mfg. Co., 424 F. App'x 931, 933 (Fed. Cir. 2011)(recognizing that a license is a defense to patent infringement).  For the reasons that follow, this Court finds that: (1) the Agreement grants MS Tech the right to commercialize; and (2) MS Tech appropriately sublicensed that right to Dow to develop and sell E3.

A.    The Agreement Grants MS Tech Commercialization Rights

    1.    English Law Applies

While the parties dispute the scope of MS Tech's rights
under the Agreement, they agree that English law governs
interpretation of the Agreement.   Under English law,[4] contractual
disputes are tried by the court.   In re McMahon, 236 B.R. 295,
306 n.4 (S.D.N.Y. 1999).   Courts interpreting contracts
consider, from the outset, both the natural and ordinary meaning
of the language of the contract and the background or
surrounding circumstances of the contract.   [Docket No. 128,
Declaration of Edwin Peel ("Peel Dec.") ¶ 14; Docket No. 162,
Declaration of Lord Collins of Mapesbury ("Collins Dec.") ¶ 29].
This background, known as the "factual matrix," includes
anything which a reasonable man would have regarded as relevant.
(Peel Dec. ¶ 11; Collins Dec. ¶ 29).   However, courts may
neither consider evidence of subsequent conduct, evidence as to
the subjective intent of the parties nor evidence of pre-
contractual negotiations.   (Peel Dec. ¶¶ 13, 18, 23; Collins
Dec. ¶¶ 28, 32, 36).   As an exception to the bar on pre-

_____

[4]    In setting forth the principles of English law, this Court
relies, as is permitted under the Federal Rules of Civil
Procedure, on both live testimony (see generally Transcript of
June 13, 2013 Hearing) and declarations from English law experts
– Professor Edwin Peel and Lord Collins of Mapesbury.   Federal
Rule of Civil Procedure 44.1 ("In determining foreign law, the
court may consider any relevant material or source, including
testimony, whether or not submitted by a party or admissible
under the Federal Rules of Evidence.").

contractual negotiations, courts may consider documents that evidence the "genesis" of a transaction.  (Peel Dec. ¶ 22; Collins, 6/13/13 Hearing Tr. 146:15-20).

Applying these principles, courts assess, objectively (Peel Dec. ¶ 13), what the contract would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.  In re Am. Home Mortg. Holdings, Inc., 386 F. App'x 209, 212-13 (3d Cir. 2010)(applying English law to interpret the language of a purchase agreement).  In doing so, courts follow a number of rules of construction:

(1)  where there are two possible constructions of an agreement, a court may take into account the "commercial purpose of the agreement";

(2)  clauses should not be considered in isolation but must be assessed in the full context of a contract;

(3)  contracts should be read to avoid rendering portions superfluous;

(4)  contractual recitals may be an aid to interpretation; and

(5)  courts may consider other contemporaneous contracts, where the contract at issue is one of a series of contracts between the parties.

(Peel Dec. ¶¶ 23, 27, 32; Collins Dec. ¶¶ 30, 52).  Finally, under English law, the court may resolve any ambiguities by looking at the agreement's commercial purpose and factual

background.  In re McMahon, 236 B.R. at 306 n.4 ("In construing

the document, the court may resolve an ambiguity by looking at

its commercial purpose and the factual background against which

it was made."(quoting English contracts treatise)); In re

HomeBanc Mortg. Corp., No. 07-51740, 2013 WL 211180, at *14

(Bankr. D. Del. Jan. 18, 2013); Crown Cork & Seal Tech. Corp. v.

Continental Pet Tech. Inc., 232 F. Supp. 2d 294, 298 (D. Del.

2002).

> 2.   English Law Allows For Construction Of The
>      Contract At Summary Judgment

Because the parties agree that English law applies to

interpretation of the Agreement, this Court will apply it in

considering Defendant's summary judgment motion.  Transportes

Ferreos de Venezeula II CA v. NKK Corp., 239 F.3d 555, 560 (3d

Cir. 2001)(applying New Jersey law where there was no dispute as

to its application).

This Court finds two other courts' discussions of the

interplay between English contract law and the American summary

judgment standard particularly helpful.  In the first case, In

re McMahon, the court held that it could resolve an issue of

English contractual interpretation as a matter of law, so long

as there were no disputed facts in the underlying factual

matrix.  In re McMahon, 236 B.R. at 306 n.4 ("In England,

contract disputes are tried to the court. In deciding this

motion, I shall look to the 'factual matrix' as PCE has
presented it. If this examination raises any questions of fact,
the interpretation of the contract will be for the jury to
decide.").   In the second case, Pannell Kerr Forster Intern.
Ass'n Ltd. V. Quek, the Ninth Circuit found that the district
court erred in granting summary judgment because the contract
was, on its face, ambiguous and the district court had failed to
consider the factual matrix, as required.   Pannell, 5 F. App'x
574, 577 (9th Cir. 2001).   That decision did not address,
however, whether it would be permissible to grant summary
judgment in reliance upon an undisputed factual matrix, as is
the case here.

    This Court agrees with, and adopts, the approach taken by
the court in In re McMahon. That approach best reconciles
English and American law because it: (1) preserves the court's
role under English law in deciding contract cases; (2) maintains
the English law rule that courts may, to the extent ambiguity
arises, resolve that ambiguity through evidence of commercial
purpose and other background evidence; and (3) is in accord with
the American summary judgment standard because the jury retains
control over genuine disputes of fact as to the underlying
factual record.[5]

_____

[5]   While the Third Circuit recently held that ambiguous contracts
must be resolved by a jury, Jang v. Boston Scientific Scimend,
Inc., No. 12-3434, 2013 U.S. Dist. LEXIS 18549, at *10 (3d Cir.

Sept. 5, 2013)(analyzing a contract under Massachusetts law and holding that "the interpretation of a contract is, in the first instance, a matter of law, but the meaning of an ambiguous provision is a question of fact") and <u>Mylan Inc. v. SmithKline Beecham Corp.</u>, 723 F.3d 413 (3d Cir. 2013), the <u>Jang</u> and <u>Mylan</u> cases are in the context of interpreting state law of <u>Massachusetts</u> and <u>New Jersey</u> law, respectively.  There does not appear to be any inherent conflict with the procedure this Court has adopted and the Federal Rules of Civil Procedure.  The ability of a court to enter summary judgment on a contractual dispute, where there are no underlying facts in dispute, instead appears to be an issue driven by the applicable state contractual law.  <u>Nadherny v. Roseland Prop. Co., Inc.</u>, 390 F.3d 44, 49, 49 n.2 (1st Cir. 2004)(recognizing that interplay is driven both by underlying state law of contracts and summary judgment procedure and noting that, under both Massachusetts and Illinois law, "there is some suggestion . . . that if the extrinsic facts are not in dispute, a judge should decide the issue even if the outcome may be debatable."); <u>see and compare</u> <u>Shepley v. New Coleman Holdings, Inc.</u>, 174 F.3d 65, 72 n.5 (2d Cir. 1999)(citing <u>Nycal Corp. v. Inoco PLC</u>, 988 F. Supp. 296, 299 (S.D.N.Y. 1997)(finding summary judgment appropriate, under New York law, "when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law.")); <u>Continental Cas. Co. v. Northwestern Nat. Ins. Co.</u>, 427 F.3d 1038, 1041 (7th Cir. 2005)(holding, under Illinois law, that "if a contract is ambiguous, its interpretation is a question of law for the court as long as the extrinsic evidence bearing on the interpretation is undisputed, and summary judgment is therefore appropriate in such cases."); <u>Mid-Continent Casualty Co. v. Titan Construction Corp.</u>, 281 F. App'x 766, 2008 WL 2340493, at *1 (9th Cir. 2008)(applying Washington law and holding that "[i]nterpretation of an insurance contract is a matter of law reviewed de novo, if there are no relevant facts in dispute."); <u>Valley Realty Co. v. United States</u>, 96 Fed. Cl. 16, 22 (Fed. Cl. 2010)("Contract interpretation is a question of law, which poses an appropriate question for summary judgment resolution."); <u>Dew Seven, L.L.C. v. Big Lots Stores, Inc.</u>, 354 F. App'x 415, 416 (11th Cir. 2009)(applying Florida law and holding that "[i]n a case involving contract interpretation, summary judgment is appropriate when any ambiguity may be resolved by applying the rules of construction to situations in which the parol evidence of the parties' intentions is undisputed or nonexistent."); <u>Penford Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.</u>, 662 F.3d 497, 505 (8th Cir. 2011)(holding, under Iowa law, that summary judgment was appropriate on contract claim where extrinsic evidence was undisputed and interpretation did not depend upon credibility of extrinsic evidence or a choice among reasonable inferences); <u>Lomree, Inc. v. Pan Gas Storage, LLC</u>, 499 F. App'x 417, 421 (6th Cir. 2012)("Summary judgment

Here, because there are no <u>material</u> facts in dispute within the relevant "factual matrix" that this Court must assess, this Court may resolve this dispute as a matter of law.[6]  For purposes of clarity, the Court deems the following as the relevant facts within the undisputed factual matrix per Plaintiffs' (the non-movant) factual presentation[7] and the undisputed factual record:

- the plain language of the agreements at issue: the Stine Agreement, the MS Tech Agreement, particularly the provisions set forth on pages 4-6 <u>supra</u>, and the 2008 agreement between MS Tech and Dow;

- that in 2003 Bayer decided to sell certain assets including genetically modified corn and soybeans [6/13/13 Hearing Tr. 89:7-10];

- that Stine Seed could not acquire certain soybean events without triggering obligations to Monsanto [<u>Id</u>. at 90:23-91:1];

- that the "carve out" of rights was done at Stine and MS Tech's insistence to avoid triggering undesired obligations to Monsanto Company [Plaintiffs' SJ Opp. Br. At 2];

interpreting an ambiguous contract would be appropriate if the relevant extrinsic evidence is uncontested and sufficient on its own to establish intent, or if the extrinsic evidence is so one-sided as to make one party's interpretation unreasonable.").

[6]   Even if this ruling is error, it would not alter the result here. Under the Third Circuit's recent <u>Mylan</u> decision interpreting New Jersey law, which similarly allows for consideration of extrinsic evidence at the outset, summary judgment is still appropriate when, considering the relevant evidence, a court determines that the contract is "unambiguous- i.e., subject to only one reasonable interpretation." <u>Mylan</u>, 723 F. 3d at 418-19.  And, here, this Court would conclude that the Agreement is subject to only one reasonable interpretation.

[7]   Gleaned in large part from Plaintiffs' brief and oral argument 6/13/13 Tr. 89:7-95:5.

- that Bayer intended to divest itself of assets and that it
  was immaterial to Bayer how any assets were divided between
  Stine and MS Tech. [Docket No. 127 at Ex. G, Transcript of
  Deposition of Margaret Keating at 97:7-24]; and

- that MS Tech paid $1 million pursuant to the Agreement and
  Stine Seed paid $4.6 million pursuant to the Stine
  Agreement [6/13/13 Hearing Tr.94:24-95:5].[8]

Plaintiffs assert that disputes related to the exact
contours of the relationship between MS Tech and Stine are
material issues of fact that would preclude summary judgment.
(See 6/13/13 Hearing Tr. 78:18-22).  As stated above, however,
what is relevant in the factual matrix is the undisputed fact
that the carve out was done at the behest of Stine and MS Tech;
Bayer did not care how the assets were divided between those
parties.  See [Docket No. 127 at Ex.G, Keating Dep. Tr. 97: ("I
don't believe that – that we cared as between those companies
[Stine and MS Tech] how it [meaning the glyphosate soybean
events and the IP that came associated with it] was divided
up.")].  This Court went to great lengths to have the Plaintiffs
provide it with record evidence demonstrating that Stine cared
what MS Tech could do with respect to commercialization rights.
[6/13/13 Hearing Tr. 249:21 - 251:12 & 252:2-6].  No such record
evidence has been presented.  Instead, Plaintiffs ask this Court

[8] This Court has not considered inadmissible evidence of pre-
contractual negotiations nor has it considered evidence of
subsequent conduct such as the material contained in the 2007 Bayer-
MS Tech contract or the Heads of Agreement as part of the factual
matrix.  See (Peel Dec. ¶¶ 13, 18, 23; Collins Dec. ¶¶ 28, 32, 36).

to infer that it mattered to Harry Stine whether or not MS Tech commercialized because: "Harry Stine only gets 19 percent versus if MS Tech doesn't sell the seed and only Stine sells the seed, then Harry Stine gets 100 percent, so the inference is Harry Stine does care about MS Tech." [6/14/13 Hearing Tr. 323:15-23]. This requested inference, however, directly contradicts the undisputed record evidence contained in Mr. Stine's deposition testimony: Mr. Stine testified that the business model of MS Tech included direct commercialization and neither Stine, nor MS Tech, contemplated MS Tech being limited to doing business with Stine [Stine Dep. at 30:3-33:7].[9] Thus, the undisputed facts in the factual matrix do not include the inference requested by Plaintiffs.[10]

---

[9]   Inferences based on mere speculation or conjecture cannot create a fact dispute sufficient to defeat summary judgment. Robertson B. Allied Signal, Inc., 914 F.2d 360, 383 n.12 (3d Cir. 1990).

[10]   It is evidence, not mere argument, that controls at the summary judgment stage. While argument is of valuable assistance to the Court in understanding the evidence, argument unsupported by the factual record or argument pertaining to a non-material matter is not relevant to this Court's analysis. See Mylan, 723 F.3d at 420 (discussing the need to take into account both the alternative meaning of the contractual language suggested by the plaintiff in conjunction with "the nature of the objective evidence offered in support of its suggested meaning" to determine whether extrinsic evidence demonstrated the existence of latent ambiguity)(emphasis added). Mindful that this Court should not be tempted by bare argument in deciding a summary judgment motion, this Court has pored over the record searching for objective evidence to support Plaintiffs' arguments; as discussed at length throughout this Opinion, it has found none.

    3.   The Agreement Allows For Commercialization By MS
         Tech

     The parties dispute the construction of Article 3.1.2 of the

Agreement.  Again, the provision reads:

     "[Bayer] hereby grants to [MS Tech] solely with regard to
     SOYBEAN a worldwide, fully paid-up exclusive license – with
     the right to grant sublicenses solely as set out in Article
     3.1.3 and with the exception of the rights to increase,
     market, distribute for sale, sell and offer for sale,
     granted to STINE by separate agreement – under the LICENSED
     PATENTS in the field of GLYPHOSATE TOLERANTE SOYBEAN solely
     to EXPLOIT GLYPHOSATE TOLERANCE GENES in M.S. SOYBEAN
     EVENTS.

     Plaintiffs contend that the "with the exception" language

strips MS Tech of any commercialization rights that would be

granted by the broadly defined right to "exploit" and that those

rights were solely granted to Stine.  Plaintiffs further contend

that MS Tech only has development rights and the right to

sublicense such rights.  Dow argues that MS Tech has full

commercialization rights and the right to sublicense such

rights.  It contends that the exception language is merely an

exception to MS Tech's exclusivity with respect to the listed

rights and that it and Stine share the rights granted to Stine.

Plaintiffs do not dispute that if Dow's construction is

accepted, MS Tech has the right to commercialize and the right

to sublicense that right.

This Court agrees with Dow's interpretation for seven reasons.  First, Dow's construction is consistent with the plain and ordinary language of Article 3.1.2.  As a matter of syntax, the "with the exception" language more naturally modifies the exclusivity of MS Tech's license than its right to exploit.  If the parties had intended to qualify the right to "exploit," the "with the exception of" language would have followed the word "exploit."

Second, Plaintiffs' construction is inconsistent with the full context of the Agreement because:

(1)  it makes little sense to define "exploit" broadly at the outset and use that term in Article 3.1.2, if the parties' intent for 3.1.2 was for MS Tech to have much more limited rights;

(2)  Articles 9.1.2 and 11.3 contemplate full exploitation rights by MS Tech[11]; and

(3)  the Agreement contemplates <u>direct</u>[12] commercialization by MS Tech of Bayer Soybean Events and, while exploitation of Bayer Soybean Events is covered under Article 3.1.1, Bayer does not dispute that its construction of Article 3.1.1 necessitates a

---

[11]  In response, Bayer has essentially argued that the term "exploit" is simply being used as a boilerplate catch-all here and truly only refers to MS Tech's more limited bundle of rights.  That does not explain, however, why exploit was defined in such broad terms at the outset to include, <u>inter alia</u>, the rights to "market, offer, [or] sell" if its meaning was to be limited throughout the Agreement.

[12]  While Plaintiffs have advanced a contorted theory to harmonize its construction of the contract with the "directly" language, the point here is simple: if Stine were the only entity that could commercialize the products at issue, then the Agreement would say just that.

construction of Article 3.1.2's parallel language that would bar such direct commercialization.

Third, Dow's construction is more consistent with the need, in the Stine Agreement, for MS Tech to specifically consent to that agreement, since there would be no need to consent to non-overlapping rights.  Dow's construction is similarly in line with the language in the Stine-Bayer agreement, which refers to Stine's commercialization rights as non-exclusive – i.e., overlapping with the commericalization rights granted on that same day to MS Tech.

Fourth, Plaintiffs' construction would render the bare-license prohibition in Article 3.1.3 superfluous.  Article 3.1.3 grants MS Tech sublicense rights, but prohibits bare licenses, meaning sublicenses without restrictions.  Under Plaintiffs' construction this provision would be superfluous because MS Tech was already limited to developmental rights and developmental sublicense rights.

Fifth, Plaintiffs' interpretation is contrary to the plain language contained in Exhibit 3.1.5 of the Agreement which explicitly refers to "direct" commercialization by MS Tech.

Sixth, Plaintiffs' interpretation is inconsistent with the recital provision that indicates that Bayer was divesting itself of the assets at issue.  Under Plaintiffs' interpretation, because Stine was the only entity that had commercialization

rights, and because those rights were non-exclusive, Bayer would still have certain commercialization rights.  This is inconsistent with divestment and the "genesis" of the agreement i.e., that Bayer wanted to divest itself of the assets.  <u>See</u> [Morgan Dep. at 52:9-14: "[W]e took a decision that if we were not prepared to make further investments in the corn and soybean business, then the best thing to do was to liquidate the value that we currently had in our hands through the divestment process to other parties."].  In addition, Plaintiffs' expert Lord Collins agreed that divestiture does not include the retention of rights by Bayer:

> Q:   What is your understanding of the term divest?
> A:   It's a strong term meaning do away with or whatever.
> Q:   To entirely –
> A:   Yes.
> Q:   -- give up rights, isn't that so?
> A:   Yes. . . .
>
> Q:   But you read divestiture to include the retention of significant rights on the part of Bayer?
> A:   No.

[6/13/13 Hearing Tr. 197:19-24 & 199:16-18].

Seventh, Dow's construction is consistent with the factual matrix[13] and business purpose of the Agreement, considering that:

_____

[13]   At oral argument and in briefing, Plaintiffs heavily focused on: (1) the fact that MS Tech paid a smaller amount than Stine but, under Dow's theory received broader rights; and (2) purported close ties between Stine and MS Tech.  For its part, Dow argued that: (1) MS Tech's smaller payment was based on the fact that MS Tech would be required to undertake large investments before selling any products; and (2) it defied commercial sense for MS

(1)   the "carve out" of rights was done at Stine's
      insistence because Stine could not take on the rights
      to certain underlying assets without triggering
      obligations to Monsanto Company;

(2)   with respect to Stine and MS Tech, the purpose of the
      carve out was to limit Stine's rights, not MS Tech's;

(3)   it was immaterial to Bayer how any assets were divided
      between Stine and MS Tech; and

(4)   under Dow's interpretation, unlike Bayer's, Bayer does
      not retain rights to the assets at issue, which is
      consistent with the parties' understanding that
      Bayer's goal was to divest itself of the assets.

While, Bayer places great emphasis on the "carve out"

language in the Agreement's recital, that language is not

inconsistent with this Court's analysis, given that there is a

"carve out" of MS Tech's exclusivity.  Therefore, "[e]xamining

the 'factual matrix' and commercial circumstances surrounding

these agreements does not give rise to any ambiguity of the

---

Tech to agree to a deal, as under Plaintiffs' construction, in
which it would face a substantial investment cost but was limited
to commercializing through Stine.  While the Court has considered
Plaintiffs' arguments, they largely amount to distraction in the
factual matrix.  With respect to Bayer's arguments, inferences
based on the structuring of the deal and close ties between Stine
and MS Tech amount to little when: (1) the only evidence is that
such structuring was immaterial to Bayer; (2) MS Tech and Stine
have offered a rationale for the structuring and, more
importantly, there is no record evidence that either party
contemplated limiting MS Tech's rights; and (3) the suggestion of
close ties between Stine and MS Tech, if anything, bolster Dow's
case that Stine would not want to limit MS Tech's rights.  With
respect to Dow's argument as to commercial sense, it seems
apparent, from the very Agreement at issue, that parties may find
it appropriate to limit themselves in this manner.  Under both
parties' construction of the agreements at issue, Stine had large
up-front costs as part of the transaction, but was obligated to
obtain approval from MS Tech before it could sell anything.
(6/13/2013 Hearing Tr. at 49:16-52:22 and 118:12-118:22)(Dow and
Bayer stating their respective positions).

plain meaning of the agreements," In re McMahon, 236 B.R. at 307, and it is clear that the language contained in Section 3.1.2 of the Agreement gives MS Tech commercialization rights.

B.    MS Tech Appropriately Sublicensed Its Rights To Dow To
      Develop And Sell E3

Having concluded that MS Tech had commercialization rights, the only remaining question is whether Dow had a valid sublicense.  Pursuant to the 2004 Bayer-MS Tech Agreement, MS Tech can "EXPLOIT" an "M.S. Soybean Event" and can sublicense its right.  Plaintiffs contend that Dow did not have a valid sublicense because E3 is not an "M.S. Soybean Event" product under the 2004 Bayer-MS Tech Agreement, as it was not made "by or for" MS Tech.[14]  There is no dispute that E3 was not made "by" MS Tech; instead, the dispute centers around whether E3 was made "for" MS Tech.

To the extent this is purely a factual issue, the record evidence is undisputed that ownership by MS Tech is sufficient to demonstrate that E3 was made "for" MS Tech.  Even Bayer's 30(b)(6) witness agreed that ownership of the event means that something was made "for" MS Tech.  [Docket No. 127 at Ex. N, Transcript of Deposition of Thomas Schulte, Ph.D. (Bayer's 30(b)(6) witness) at 140:9-15].  There is no dispute that MS

[14]    The parties agree that an M.S. Soybean Event is one "made by or
        for" MS Tech.  [Def.'s Br. At 29 & Pls.' Opp. Br. At 24].

24

Tech owns E3. [Docket No. 127 at Ex. N, Transcript of Deposition of Thomas Schulte, Ph.D. (Bayer's 30(b)(6) witness) at 140:9-15; Keating Dep. at 131:10-132:14; Stine Dep. at 40:14-42:4; Saluri Dep. at 48:7-49:2].

While the parties to the agreement, MS Tech and Dow, agree that E3 was made "for" MS Tech, Plaintiffs nevertheless set forth several fact-based arguments in an attempt to undercut that conclusion. First, Plaintiffs argue that Dow does not have a valid sublicense based on an email sent by Justice Mansfield, counsel for MS Tech during negotiations for the 2008 MS Tech-Dow agreement. During those negotiations, Justice Mansfield sent an email stating that E3, then referred to as the "Molecular Stack," is not an "MS Tech Event" as defined in the 2008 agreement between Dow and MS Tech. The language in the 2008 agreement defines an "MS Tech Event" as any Event or Stack which is made "by or for" and is controlled by MS Tech; this language is parallel to the 2004 Agreement language, which, as discussed above, defines an M.S. Soybean Event as one made "by or for" MS Tech. Thus, if E3 is not an "MS Tech Event," Plaintiffs aver that it cannot be an "M.S. Soybean Event." This argument falls flat, however, because it utilizes extrinsic evidence to the 2008 contract where the parties to that very contract agree on the unambiguous meaning of the "by or for" language at issue. Westchester Surplus Lines Ins. Co. v. Stonitsch Constr., Inc.,

572 F. Supp. 2d 946, 949 (N.D. Ill. 2008)(applying Illinois law, which "bars consideration of extrinsic evidence when the contract is facially unambiguous and fully integrated.")[15] Moreover, even if this Court were to consider the evidence, it is undermined by Justice Mansfield's clarification in his deposition that it was "crystal clear" that "AAD-12 [one of the genes included in the E3 triple stack] was coming in to MS Tech and that the event was going to be made for MS Tech." [Mansfield Dep. 95:21-96:4 (emphasis added)].

Next, the Plaintiffs assert that Dow's control of two of the three genes making up the triple stack and the fact that E3 was created with joint assets, joint funding, and that costs, profits and losses are shared all indicate that E3 was not made "for" MS Tech. [Pls.' Opp. Br. at 36]. Plaintiffs' conjectural conclusions from such facts, however, do not trump the reality of the clear understanding between the parties to the MS Tech and Dow contract that, ultimately, E3 was made "for" MS Tech.

Finally, while even Plaintiffs have had to admit that, on its face, the 2008 contract between MS Tech and Dow "arguably reflects that MS Tech granted [Dow] a license to E3 'for purposes of development' 'on behalf of MS Tech,'" [Pls.' Opp. Br. At 27-28], they nevertheless argue that this language was a

---

[15]   It is undisputed that Illinois law applies to the 2008 MS Tech - Dow contract.

"pretense" and that Dow also received the future right to commericalize in the 2008 contract, which is indicative that E3 was not made "for" MS Tech.  Again, the parties to the 2008 agreement, MS Tech and Dow, agree that E3 was made "for" MS Tech.  Once the E3 is made "for" MS Tech, MS Tech can, pursuant to the broad sublicense rights contained in Section 3.1.3 of the Agreement, sublicense its commercialization rights.

In the event that the issue of whether E3 is made "for" MS Tech is instead viewed as an issue of law, the outcome is the same.  This Court finds, as a matter of English law[16], without fully defining the ambit of "for MS Tech," that "for MS Tech" is consistent with mere ownership for three reasons.  First, the factual matrix and commercial purpose described above indicate that the parties intended to afford MS Tech extremely broad rights under the Agreement to utilize the assets it acquired as it saw fit, with the only meaningful limitation being the bare license restriction.  Second, in light of that, and the plain meaning of "for," this Court construes the term to include any actions taken that inure to the benefit of MS Tech, regardless of whether another party also benefits.  Third, with MS Tech retaining ownership, the license does not run afoul of the Agreement's prohibition on bare licenses.

[16]    This Court may do so because, as discussed above, questions of English law are appropriately resolved by the Court when there is no dispute as to the factual matrix.

Plaintiffs have cited cases suggesting that Dow's participation in the E3 product is inconsistent with "for" MS Tech, because, as Plaintiffs assert, the language "by or for" indicates that MS Tech can only exercise "have made" rights to hire contractors to make products for them and that those contractors cannot themselves sell the product.  The cases cited by Plaintiffs are inapposite, however, because they arose in contracts that lacked sublicense rights, unlike the Agreement here.  CoreBrace LLC v. Star Seismic LLC, 566 F.3d 1069, 1073 (Fed. Cir. 2009); E.I. du Pont de Nemours & Co. v. Shell Oil Co., 498 A.2d 1108, 1114-15 (Del. 1985); Intel Corp. v. U.S. Int'l Trade Comm'n, 946 F.2d 821, 828 (Fed. Cir. 1991).  Again, MS Tech can, pursuant to the broad sublicense rights contained in Section 3.1.3 of the Agreement, sublicense its commercialization rights.

IV.  Conclusion

For the reasons discussed in detail above, Defendant's motion for summary judgment is GRANTED.

s/Renée Marie Bumb
RENÉE MARIE BUMB
United States District Judge

Dated:  October 7, 2013

28