[Docket Nos. 317, 374 & 384]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

BAYER CROPSCIENCE AG, et al.,

                Plaintiffs,

      v.                        Civil No. 12-256 (RMB/JS)

DOW AGROSCIENCES LLC,          **OPINION**

                Defendant.

Appearances:

Robert J. Koch
Stephanie R. Amoroso
Edward J. Mayle
Milbank, Tweed, Hadley &
 McCloy LLP
1850 K Street NW, Ste. 1100
Washington, DC 20006

Fredrick M. Zullow
Christopher J. Gaspar
Milbank, Tweed, Hadley &
 McCloy LLP
1 Chase Manhattan Plaza
New York, New Your 10005

Frederick L. Cottrell, III
Jeffrey L. Moyer
Travis S. Hunter
Richards, Layton & Finer, P.A.
One Rodney Square 920 North
  King Street
Wilmington, DE 19801

Attorneys for Plaintiffs

Peter A. Bicks
James L. Stengel
Alex V. Chachkes
Orrick, Herrington &
 Sutcliffe LLP
51 West 52nd Street
New York, New York  10019

Elizabeth A. Howard
Orrick, Herrington &
 Sutcliffe LLP
1000 Marsh Road
Menlo Park, California  94025

Steven J. Balick
Lauren E. Maguire
Andrew C. Mayo
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899

                    Attorneys for Defendant

**Bumb**, J. (by designation):


    This matter is before the Court upon a Report and

Recommendation issued by the Honorable Joel Schneider, United

States Magistrate Judge [Docket Nos. 374, and 384 (Amended)] ("Report and Recommendation") relating to Defendant Dow Agrosciences, LLC's ("Dow") Motion for Fees and Costs as Prevailing Party [Docket No. 317] against Plaintiffs Bayer Cropscience AG, et al. ("Bayer").  Bayer has filed its Objections to the Report and Recommendation [Docket No. 388] ("Bayer Obj.").  Judge Schneider found that based on the totality of the circumstances, Bayer's Complaint was "so plainly non-meritorious that no reasonable party or attorney could realistically expect success.  Bayer's complaint should not have been filed.  The exceptional nature of the case is compounded by the lack of pre-suit due diligence."  Report and Recommendation, at 19.  For the reasons that follow, the Court adopts Judge Schneider's Report and Recommendation and will award fees to Dow.  The Court reserves on the amount to be awarded.

I.    Procedural History

        On June 29, 2012, Bayer filed the within patent infringement suit against Dow.  The Complaint alleged infringement by Dow of seven patents owned by Bayer involving certain soybean technology, specifically the *dmmg* gene that confers resistance to the herbicide glyphosate.  The Complaint sought to enjoin Dow from selling its Enlist E3 soybean seeds

that contain a "Triple Gene Event" which includes the *dmmg* gene.[1]
On October 17, 2013, this Court granted summary judgment in
favor of Dow.  Bayer appealed, and the Court of Appeals for the
Federal Circuit affirmed without opinion.

   A.   Pre-Complaint Conduct

   In the earlier filed Bayer I, see n.1, Bayer filed a motion
for leave to add infringement claims relating to the seven
patents covering the *dmmg* gene.  The parties spent months
briefing the motion, but four days before the hearing on the
motion, Bayer withdrew it.  Bayer thereafter filed a separate
lawsuit (this one) which was assigned to the Honorable Richard
G. Andrews.  The case was eventually reassigned to this Court

---

[1] As the name implies, the Triple Gene Event comprises three
herbicide-resistant genes.  (The gene's integration into the
plant cell's chromosome is called an "event.")  The first gene,
"*aad-12*," confers resistance to the herbicide "*2,4-D*."  Bayer
had sued Dow for infringement of its patent covering this gene
in Bayer Cropscience Ag v. Dow AgroSciences LLC, Docket No. 10-
1045 (RMB) (D. Del.) before this Court ("Bayer I").  This Court
found non-infringement, and the Federal Circuit affirmed.  The
second gene, "*pat*," confers resistance to the herbicide
"glufosinate."  Bayer has asserted infringement of four of its
patents covering this gene against Dow in the Eastern District
of Virginia.  See Bayer CropScience Ag v. Dow AgroSciences LLC,
No. 12-47 (RAJ) (E.D.Va.) (Bayer III).  Within days of the
filing of the Complaint here, the Court in the Eastern District
of Virginia granted Dow's motion to stay the case pending
arbitration under the parties' license agreement.  The third
gene, "*dmmg*," is the subject of the within suit involving seven
of Bayer's patents related to this gene.

who had already become familiar with the subject matter as a result of Bayer I.[2]

B.  Complaint: Motion to Dismiss

Shortly after the Complaint was filed, Dow filed a Motion to Dismiss the Complaint before Judge Andrews.  [Docket No. 8]. Just as it had argued in its opposition to Bayer's Motion to Amend the Complaint in Bayer I, Dow argued that it had a 2008 sublicense that authorized it to market its E3 product.  Thus, it did not infringe.  More specifically, Dow argued that it had a sublicense related to Bayer's patents to work with MS Technologies, LLC ("MS Tech") to develop a new soybean product. Dow cited a May 28, 2004, Agreement wherein Bayer granted MS Tech a broad license under its seven *dmmg* patents to make and commercialize soybean products having the glyphosate tolerance gene as well as an equally broad right to sublicense such rights (the "Agreement").  Under a derivative 2008 sublicensing agreement between MS Tech and Dow, Dow developed the Triple Gene Event (E3 soybeans) on behalf of MS Tech, with MS Tech providing the *dmmg* gene and Dow providing the *aad-12* and *pat* genes.

---

[2] Dow does not base its motion for attorney's fees based on this pre-complaint conduct nor did Judge Schneider base his recommendation on such conduct.  This Court, too, does not award any fees relating to such conduct but it cannot help but question Bayer's decision to litigate against one defendant, Dow, for its alleged infringement of three different traits in the E3 product – *2,4-D,* glyphosate, and glufosinate – in two separate forums.

Bayer opposed the Motion to Dismiss before Judge Andrews,

raising several points.  In relevant part, Bayer argued that

pursuant to its related agreement with Stine Seed Farm, Inc.

("Stine"), only Stine, not MS Tech, could market seeds under

Bayer's patents.  Specifically, Bayer argued:

> Bayer granted to MS Tech exclusive rights to create
> (and to subcontract to third parties to create)
> soybean events using Bayer's technology.  MS Tech has
> additional rights to "exploit" the technology, which
> include activities such as breeding or using plants
> incorporating the technology, for example, to obtain
> regulatory approvals or for other experimental
> purposes.  However, rights incident to the commercial
> sale of soybean seeds incorporating Bayer's technology
> were not given directly to MS Tech.  Those rights were
> given only to Stine but *cannot be sublicensed*.

[Docket No. 11, at 6] (emphasis added).

Bayer accused Dow of a "gross misunderstanding of the

licensing arrangement among Bayer, MS Tech and Stine."  [Id. at

8].  Bayer did not mince words:

> These contractual provisions unambiguously reflect
> Bayer's deliberate choice to allow Stine – – and only
> Stine – – to market and sell transgenic soybean seeds
> that use Bayer technology under a Stine brand or a
> brand of a Stine affiliate.  The "with the exception
> of the rights . . . granted to Stine by separate
> agreement" clause should have alerted [Dow], at
> minimum, that MS Tech's license from Bayer was not
> unrestricted.

[Id. at 7] (emphasis added).

After conducting oral argument, Judge Andrews held that

Dow's sublicense defense was a "factual" one that prevented the

Court from going beyond the pleadings at the motion to dismiss stage. [Docket No. 26].

C. Motion for Preliminary Injunction

Judge Andrews thereafter entered a scheduling order [Docket No. 39] that established February 28, 2014, as the discovery deadline. However, within one month of the scheduling order, and in the midst of discovery, Bayer filed a motion for a preliminary injunction. [Docket No. 51]. Bayer did so, knowing that Judge Andrews had set the discovery deadline for Dow's sublicensing defense for April 4, 2013, and the parties were in the midst of extensive discovery (including discovery disputes). Dow argued that Bayer's motion "threaten[ed] to unravel the discovery." [Docket No. 61]. Bayer responded, however, that Dow did "not need any discovery beyond what Bayer has already provided to address Bayer's likelihood of success on the merits." [Docket No. 65].

D. Summary Judgment

During the pendency of the preliminary injunction motion, the case was transferred to this Court. The Court established new deadlines and permitted the filing of a motion for summary judgment by Dow based on its licensing agreement defense. On May 9, 2013, Dow filed a motion for summary judgment. The Court conducted a two-day hearing on June 13-14, 2013. On October 7,

2013, the Court granted Dow's motion for summary judgment. [Docket Nos. 268 (Opinion ("Op.") and 269 (Order)].

In its summary judgment Opinion, this Court agreed that Dow had a valid sublicense from MS Tech to develop and sell E3. The Court found that there were no material facts in dispute. Op. at 16. The Court also found that the arguments Bayer had made were just that, arguments: "this Court has pored over the record for objective evidence to support Plaintiff's arguments . . . it has found none." Op. at 18, n.10. The Court held that the Agreement's license provision was "subject to only one reasonable interpretation [-Dow's]" and that Dow's interpretation was the only one "consistent with the factual matrix and the [Agreement's] business purpose." See Op. at 16 n.6 and 22. The Court further set forth seven reasons why Bayer's position on the license failed under English law, which the parties agreed governed. In sum, the Court found that Bayer's position was contrary to the plain language and business purpose of the Agreement, and that Bayer's arguments rested on contorted theories that amounted to nothing more than distraction.

E. Motion for Attorney's Fees

On May 19, 2014, after the Federal Circuit's affirmance of this Court's Opinion and the Supreme Court's decision in Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S.Ct. 1749

(2014), Dow filed a Motion for Fees and Costs as Prevailing
Party. [Docket No. 317]. In its motion, Dow argued that this
case was an "exceptional case" entitling it to recover its
attorney fees pursuant to 35 U.S.C. § 285. The Court referred
this matter to Judge Schneider for a Report and Recommendation.
On December 22, 2014, after holding a two-day hearing, Judge
Schneider entered a Report and Recommendation recommending (1)
that Dow's motion be granted, in part, and (2) that Dow be
awarded $5,761,936.79 in fees.

Pursuant to Fed.R.Civ.P. 72 and L.Civ.R. 72.1(c)(2), Bayer
filed its Objections to the Report and Recommendation. The
Court turns to the parties' arguments.

II. <u>Legal Analysis</u>

A. <u>Standard of Review</u>

When a party has objected to a Magistrate Judge's Report
and Recommendation, the District Judge "shall make a <u>de novo</u>
determination of those portions to which objection is made and
may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the Magistrate Judge." L.Civ.R.
72.1(c)(2). A <u>de novo</u> determination "means an independent
determination of a controversy that accords no deference to any
prior resolution of the same controversy." <u>United States v.
Raddatz</u>, 447 U.S. 667, 690 (1980)(Stewart, J., dissenting).
Therefore, <u>de novo</u> review "means reconsideration afresh by the

[D]istrict [J]udge in this sense: no presumption of validity applies to the [M]agistrate's findings or recommendations." Greene v. WCI Holdings Corp., 956 F.Supp. 509, 514 (S.D.N.Y. 1997)(quoting 7.2 James Wm. Moore, Moore's Federal Practice, 1 72.04[10.-2], at 72-96 (1995).

B. "Exceptional Case"

Pursuant to 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."[3]  Whether a case is exceptional is to be determined on a case-by-case basis, considering the totality of the circumstances.  Octane Fitness, LLC v. ICON Health & Fitness, Inc., 134 S.Ct. 1749 (2014).  There is "no precise rule or formula for making" a determination as to whether a case is exceptional.  Biax Corp. v. Nvidia Corp., 2015 WL 755940, *2 (Fed. Cir. February 24, 2015)(citing Octane Fitness).  An exceptional case is one that "stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." Id. citing Octane Fitness, 134 S.Ct. at 1756).

The Supreme Court has cited a number of nonexclusive factors district courts may consider, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular

---

[3] There is no dispute that Dow is the prevailing party here.

circumstances to advance considerations of compensation and deterrence." Id. at 1756 n.6. Further, "[d]istrict courts may determine whether a case is exceptional in case-by-case exercises of their discretion, considering the totality of the circumstances." Id. at 1756. Because the exceptional case designation is guided by the district court's "better position[]" to decide the issue, the finding is committed to the sound discretion of the district court. Hishmak Inc. v. Allcare Health Management System, Inc., 134 S. Ct. 1744, 1748 (2014). Patent litigants are only required to establish their entitlement to fees by a preponderance of the evidence. Octane Fitness, 134 S. Ct. at 1749, 1756.

Among the most commonly cited ways to establish exceptionality are: (1) establishing that the plaintiff failed to conduct an adequate pre-filing investigation or to exercise due diligence before filing suit (see, e.g., Yufa v. TSI Inc., No. 09-01315, 2014 WL 4071902, at *3 (N.D. Cal. Aug. 14, 2014)); (2) showing the plaintiff should have known its claim was meritless and/or lacked substantive strength (id.); (3) evidencing the plaintiff initiated litigation to extract settlements from defendants who want to avoid costly litigation (Summit Data Sys., LLC v. EMC Corp., No. 10-749, 2014 WL 4955689, at *3-4 (D. Del. Sept. 25, 2014)); (4) showing a party proceeded in bad faith (Pure Fishing, Inc. v. Normark Corp.,

No. 10-2140, 2014 WL 5474589, at *4 (D.S.C. Oct. 28, 2014)

(noting that bad faith is no longer required to support an award

of fees but finding the plaintiff's position was not

reasonable)); and (5) litigation misconduct (Logic Devices, Inc.

v. Apple Inc., No. 13-02943, 2014 WL 6844821, at *4 (N.D. Cal.

Dec. 4, 2014)).

C.    Discussion

1.    Objections to Award

Bayer first objects to the Report and Recommendation on the

grounds that "only by exaggeration of an otherwise benign record

could this case be deemed exceptional." Bayer Obj. at 2.  The

Court flatly rejects Bayer's nonpenitent view.  This Court

conducted a two-day hearing on the motion for summary judgment.

Bayer opposed summary judgment on several grounds.  Bayer's

case, however, became more anemic upon review of each piece of

evidence.  Bayer's own witnesses as well as key documents

contradicted Bayer's contorted reading of the contract.

Second, Bayer contends that both this Court and the Federal

Circuit were wrong and argues that Bayer did, in fact, retain

its patents.  As such, it argues, this evidence supports Bayer's

understanding that MS Tech's commercialization with Dow

infringed its retained patents.  Bayer pettifogs.  This argument

is a red-herring and must be put to rest.[4]  First, this Court
ruled in its Opinion that the record was clear and undisputed
that in 2003 Bayer had made the decision to get out of the
soybean business.  In connection therewith, Bayer sold the
glyphosate soybean events and the IP rights that came associated
with them.  Yet, in the face of such evidence, Bayer continues
to argue otherwise, that MS Tech could not sell the product
because Bayer retained the patents.  But even assuming Bayer did
retain such rights – an argument that appears to have only first
appeared on appeal – it is not material: the record was
undisputed that Bayer granted MS Tech an exclusive license to
sell the product associated with those patents.  In other words,
that Bayer retained ownership of the patents associated with the
*dmmg* technology is immaterial to whether Bayer nonetheless
granted an exclusive license to MS Tech to commercialize product
under those patents.

    Bayer's own witnesses confirmed such conclusion which this
Court found was consistent with the plain text of the Agreement.
First, Margaret Keating, Bayer's in-house counsel, confirmed
this understanding at her deposition.[5]  Second, David Morgan,

---

[4] Bayer unsuccessfully argued this point before the Federal
Circuit as well.

[5]     Q. Going back to what was on your mind in 2003, 2004,
        did Bayer care how MS Tech and Stine divided up the
        assets and IP that it was acquiring?

Bayer's executive who was responsible for Bayer's agricultural seed group at the time, explained at his deposition why Bayer decided to leave the soybean business and that the purchasers, MS Tech and Stine, were able to make "full use" of the *dmmg* technology.[6]  Morgan explained at his deposition:

---

> A. Again, you're talking about the -- are we just talking about the glyphosate soybean events or all of the –
> Q. Let's say the glyphosate soybean events <u>and the IP that came associated with it.</u>
> A. I don't believe that -- that we cared as between those companies how it was divided up.
> We wanted to be very sure that what we were transferring was appropriate and was only as broad as it needed to be, but with respect to the glyphosate tolerance soybeans, because that was -- that split up was at the request of MS Tech at the time or MS Tech and Stine, that group, I don't recall that we had a strong opinion who would receive which of the rights.

Keating Deposition, Sigworth Decl., Ex. 38, at 95:6-25–96:12 (emphasis added).

> Q. Let's get to the punch line which was: What was the recommendation?
> A. The recommendation was that while Bayer had strong positions in certain crop sectors inasmuch that they had both seed assets and biotechnology assets in a number of crops, they did not have a particularly strong position in other major crops, notably corn and soybeans.  And at the time of the 2003 dialogue, we evaluated our options to secure access to corn and soybean genetics by way of looking to acquire companies that would help to establish the footprint for us.
>
>                      . . .
>
> And so this whole process, the one that we're relating to here, is relating to a process to seek the opportunities to - - to explore opportunities with third parties who we felt might be interested in acquiring these assets.

13

Q. And as - - and as one of the key business people
responsible for this divestiture, is it your view that
that kind of licensing that you discussed was
permissible under these transactions?
A. Yes.  I mean I - - I think it was relatively black
and white certainly in my mind that we were divesting
these assets. [MS Tech/Stine] was acquiring these
assets and, of course, the value of these assets for
[MS Tech/Stine] was in [the] ability to make full use
of them.

Docket No. 320-7, at 61-62 (emphasis added).

Morgan continued:

[I]n the divestment of particularly the . . .
glyphosate event that was . . . sold to Mr. Stine,
that he would thereby have the rights to use that in
the future development of his business however he saw
that appropriate to evolve . . . .
Q. And as the business person who was in charge of
this transaction, was that your understanding and
intent?
A. Yes, it was.  It seems incongruous that we would
sell an asset to somebody, receive remuneration for
the sale, and then somehow prevent the acquirer from
making use of the asset he just acquired.

Id. at 91 (emphasis added).[7]

---

Docket No. 320-7, at pages 33, 34.

[7] It is clear that Morgan spoke of Stine and MS Tech
interchangeably.

"Sorry.  I used the word Stine collectively as the
companies that constitute the Stine group of
companies, so that does absolutely include MS Tech and
Mertec on - - on that side of the Stine business. . .
So we under . . . we understood or we understood that
MS Tech and Mertec were legal entities within the
Stine group who would be signatories to these
transactions as appropriate.

The evidence was further undisputed that upon signing the deal, Morgan wrote a congratulatory e-mail to Stine on June 4, 2014. [Docket No. 321-1, page 2]("We wish you every success in capturing the intrinsic value that these assets promise. We were disappointed that Bayer was unable to convert that potential given our (lack of) market presence, but we are convinced that in your capable hands these 'products' will find their true worth in the market")(emphasis added). Cf., Vincent Turries, BioScience Management and Divestment Team [Docket No. 321-1, page 3]("The closing is now done and the seeds have been sent.") (emphasis added).

Thus, the record was clear that Bayer had conveyed the events and IP associated with those events to Stine and MS Tech for the purpose of putting product into the market. The argument now asserted by Bayer, that because it retained the patent rights it was justified in bringing an infringement case against Dow, is fallacy. Even assuming it did retain such patent rights, there was no dispute that when Bayer sold the events it also conveyed the IP rights to make use of the events. The transaction made no business sense, otherwise. As Morgan explained:

So here's a physical hard asset. In order for you to

_____

Id. at 92.

15

make use of this hard asset, we of course would need
to give you the rights under our intellectual property
estate for you to make use of these assets.

Id. at 12-22.

Moreover, as Judge Schneider correctly found, Bayer's

arguments were implausible given the significant amounts of

money paid.  It made no commercial sense for MS Tech to pay

one million dollars only for development rights.  And as

this Court found, it made little sense to define "exploit"

broadly if the parties' intent was for MS Tech to have much

more limited rights.

Witnesses, other than Bayer's witnesses, shared the same

view of the Agreement.  Joseph Saluri, MS Tech's corporate

counsel at the time the agreement was negotiated, testified at

his deposition that the parties understood MS Tech could market

the soybean product.[8]

---

[8] Q. And if you mention there's an exception, what is
that in 3.1.2?
A. So, as we saw on that divestment schedule, the
earlier exhibit, that Stine Seed Farm had paid a
portion of the total of divestment dollars for a right
to increase, market, distribute for sale, offer for
sale.  And it's a different definition of "exploit,"
but they are rights granted to Stine by a separate
agreement that was executed as part of the 14 or so
agreements signed at the conclusion of the divestment.
Q. So if somebody told you that this exception to
Stine limited MS Tech's rights in any way, how would
you respond?
A. That that's ridiculous.
Q. Why is that the case?
A. Because that was clearly not the intent.

Moreover, Edward Mansfield, now a sitting Iowa Supreme
Court Justice, and then a contract law professor who worked on
the deal and dealt directly with Keating, testified at his
deposition that it was very clear to all parties involved in
2004 that MS Tech had the right to commercialize:[9]

---

Q. It says, "an exception."  Exception to what?
A. It's an exception to the exclusivity.  Stine had
negotiated a right to sell and market products that
would have been taken forward by MS Technologies under
this exhibit here.
Q. And then in the agreement with Stine, the license
with Stine from Bayer, Stine has to go to MS Tech and
get a license, and then they could market, distribute
and sell, but they have no right to sublicense, they
have no right to breed, they have no right to do some
of the other broad allowances under the definition of
"exploit" in this Exhibit 502.
Q. Okay.  If someone told you the license in 3.1.2 is
to events but not seeds, and it excludes seeds, what
would you say to that?
A. I would say that that is probably biologically
impossible and nonsensical.
Q. Why is that?
A. Because soybean events are necessarily seed.

Sigworth Declaration, Saluri Dep., at 41-43.

[9] Q. All right.  Is there any question in your mind that
MS Tech had the right to sublicense to their parties,
including our client, Dow AgroSciences, the right to
commercialize this Glyphosate-Tolerant Technology
that's talked about in this agreement?
A. No, I did not have a question.
Q. And you're both an experienced lawyer and also a
judge; you know that there's some cases where you sit
there and you say, "This is a close call," and there
are others where you say, "Come on.  This is what the
agreement says on its face."  Within that spectrum of
real disputes versus ones that seem to be kind of
covered by the plaintiff - -

Finally, Harry Stine, an officer of Stine Seed and business partner in the deal, testified at his deposition:

> Q. So just to sum it all up, tell me how you feel
> about Bayer's position that 3.1.2 allows MS Tech to
> exploit MS Soybean Events, meaning events, but not
> seeds.
> A. From my perspective, that's an absolutely
> ridiculous, unreasonable, and never considered
> definition there.

Docket No. 321-5, at 51-52 (Stine Dep.)

> Q. And what do you think of Bayer's position that non-
> exclusive here means that Bayer kept rights?
> A. That was never ever discussed and never ever agreed
> to and never ever brought up during the almost 10
> years since we have signed this.
> Q. Would that have made commercial sense?
> A. No.

Id. at 60.

---

> Q. – – in terms of the agreement, can you tell us
> where you think the question fits in?
> A. I think this was very clear in 2004 that MS Tech
> had those rights.
> Q. Did anybody at Bayer, during that four-month period
> of time that you were involved, ever say to you in
> words or substance that MS Tech could not sublicense
> the right to commercialize this technology?
> A. No.
> Q. Was the right to sublicense the commercialization
> prospect for this technology for MS Tech a significant
> part of this deal?
> A. Yes.
> Q. And can you explain to us why?
> A. Well, for one thing, MS Technologies, as I
> understood it, was not a huge company. And there
> could well be a desire to work with other companies in
> order to bring these glyphosate-resistant traits to
> market.

Docket No. 322-1, Ex. T. Mansfield Dep. at pages 41-43.

In sum, Bayer's argument that it retained the patents and therefore was justified in pursuing its case against Dow is a fallacious one. There was not one piece of evidence to support Bayer's position that even if it retained the patents, MS Tech could not make use of them in its commercialization efforts. The business deal made no sense otherwise. Bayer's commercialization argument was and continues to be mere obfuscation.

In yet another unfounded argument, Bayer asked this Court to infer that it mattered to Harry Stine whether or not MS Tech commercialized because: "Harry Stine only gets 19 percent versus if MS Tech doesn't sell the seed and only Stine sells the seed, then Harry Stine gets 100 percent, so the inference is Harry Stine does care about MS Tech." [6/14/13 Hearing Tr. 323:15-23]. This inference was merely contrived lawyer argument. As the evidence demonstrated, Stine understood that the nature of the relationship was that MS Tech would be able to commercialize.

> Q. So if someone told the court that when you read
> 3.1.1 that that meant that MS Tech couldn't
> commercialize Bayer Soybean Events and Stine could,
> would that be correct?
> A. That would be incorrect.

Stine Dep. 32: 9-13. Stine's unequivocal acknowledgement that MS Tech could commercialize obliterated Bayer's manufactured inference that because MS Tech paid less, it was not granted

commercialization rights.  Moreover, the evidence showed that Bayer did not care how the assets were divided between MS Tech and Stine.  The record was uncontroverted on this point.  As such, Bayer's efforts to defeat summary judgment – on the grounds that the Stine-MS Tech relationship left material disputes of fact - was objectively unreasonable.

Further, Bayer's efforts in this litigation to create an issue as to MS Tech's ownership of E3 and to preclude summary judgment were specious for the reasons this Court previously articulated.  As this Court found, Bayer's creative lawyering did "not trump the reality of the clear understanding between the parties to the MS Tech and Dow contract that, ultimately, E3 was made" for "MS Tech." [Opinion, Docket No. 268, at 26]. Bayer's own witnesses confirmed that E3 was made for MS Tech.

This Court is troubled by the current evidence before it that, contrary to the arguments made before this Court and the Federal Circuit, there was a "dispute" as to whether E3 was made by or for MS Tech, Bayer told the arbitration tribunal in Bayer III, supra n.1, that "MS Tech has always owned the Enlist E3 event," and that this was "undisputed."  See Docket No. 318, Exhibit P, ¶ 178.  This Court spent considerable time addressing Bayer's arguments at the summary judgment stage wherein Bayer disputed the fact that E3 was made for MS Tech.  See Opinion at 24-28.  That Bayer later admitted that MS Tech always owned E3

is disturbing evidence of its litigation misconduct.  See
Palcsesz v. Midland Mutual Life Insurance Co., 87 F. Supp. 2d
409, 415 (D.N.J. 2000)("It is difficult to get around the
conclusion that, in at least one of the fora, [plaintiff] was
not completely honest.")

Bayer goes on the offensive here.  According to Bayer,
under the 2004 license, MS Tech must own E3 events because
events containing *dmmg* must be by or for MS Tech.  Under the
1992 agreement (relevant to the Bayer III litigation), Dow must
own E3 in order not to breach the agreement.  Thus, Bayer,
contends Dow has been put in an irreconcilable ownership
problem.  That may or may not be, but Bayer's line of attack
detracts from the Court's task at hand.  The point here is what
was represented to this Court about the ownership of E3.  In
opposing summary judgment, Bayer claimed that the ownership of
E3 was a "fact question" that was "disputed" and "material" and
thus, prevented summary judgment.  The Court is troubled by the
fact that, even in the face of contrary evidence from its own
witnesses as to MS Tech's ownership of E3, Bayer opposed summary
judgment.  As much as Bayer wants to focus on what Dow
represented before the arbitration tribunal, the proper focus is
in what occurred before this Court.  The bottom line is:  Bayer
took an objectively unreasonable position that there was a

dispute as to whether E3 was made for MS Tech.  The record was clear that it was, as the Court previously found.

Finally, Bayer attempts to defend its litigation conduct by relying on Dow's allegedly belated production of a 2011 amendment to its 2008 agreement with MS Tech, a defense Judge Schneider viewed as a mere straw man.  Essentially Bayer argues that Dow needed to prove that it had a license to commercialize the E3 product, but Bayer did not receive the 2011 amendment until after the lawsuit due to Dow's dilatory production.  Thus, Bayer argues, it was justified in prosecuting its case until it received the subsequent amendment.  Bayer goes so far as to bring this Court into the fray by contending that the Court relied on the 2011 amendment in finding a valid sublicense.  The Court did not.  Trying to understand how Bayer could make such statement, the Court foraged its own Opinion.  It found only a string citation to the 2011 amendment.  Op. at 7 (citing to Docket No. 127, Exhibits Q,R,S).  Bayer's argument that this Court somehow relied on the 2011 amendment when the entire Opinion explicitly focused on the 2008 agreement is patently disingenuous.  Bayer's attempt to place blame on Dow when there are no material distinctions between the 2008 contract and the 2011 amendment – as evidenced by the Court's express reliance on the 2008 contract – is simply inexcusable.

In sum, Bayer's conduct in litigating this case in the face of evidence that contradicted its contorted reading of the Agreement was objectively unreasonable. The parties agreed that English law governed the Agreement. That means, both the natural and ordinary meaning of the language <u>and the background or surrounding circumstance</u> of the contract – the so-called "factual matrix" – are considered. Op. at 11. Thus, given Bayer's acknowledgment that English law governed, Bayer had an obligation to inquire into the background or surrounding circumstances of the Agreement. It should have objectively assessed what the Agreement conveyed to a "reasonable person having all the background knowledge which would have reasonably been available to the parties in the situation in which they were at the time of the contract." Op. at 12. It did not. Added to the fact that no witness supported Bayer's construction of the Agreement, and that Bayer's construction made no commercial sense, Bayer's (continued) interpretation was objectively unreasonable.[10]

---

[10] Bayer's contention that its own expert testified that Bayer's construction was correct is wrong. It was clear to this Court through the cross-examination of Lord Lawrence Collins that he was unaware of the factual matrix ("The Court: Right. So you've - - you've given an opinion but I don't get the sense that, you know, you're so confident in that opinion without really knowing what the facts are because you made a lot of assumptions. The Witness: I think that's the problem with an expert witness giving a view on the facts . . . .") S.J. Hearing Tr. at 206.

Bayer defends itself by claiming that it was "unaware" that Dow had a license until Dow opposed Bayer's motion to amend the Bayer I Complaint. If that were the case, by Bayer's own admission, Bayer had a duty to investigate such license defense before filing another lawsuit. Had Bayer done any due diligence, it would have learned that no witness supported Bayer's construction of the Agreement and this case would should never have been filed. At a minimum, under Bayer's logic, it should have dismissed the Complaint when Dow produced the amendment on November 20, 2012, months within the filing of the Complaint. [See Docket No. 21, at Ex. 1].

Even by the time that Dow had filed its Motion to Dismiss, Bayer had not investigated Dow's licensing claim.[11] Bayer's language before Judge Andrews was unduly harsh:

> "When this business arrangement among Bayer and MS Tech and Stine is properly understood, all of DAS's arguments unravel."
>                     . . .
>
> "[Dow has a] gross misunderstanding of the licensing arrangement among Bayer, MS Tech and Stine . . . ."
>
>                     . . .
>
> "[R]ights incident to the commercial sale of soybeans incorporating Bayer's technology were not given directly to MS Tech. Those rights were given only to Stine but cannot be sublicensed."

---

[11] Bayer's reliance on Judge Andrews' denial of the Motion to Dismiss is wholly misplaced. No decision on the merits was reached by Judge Andrews.

Docket No. 11 at 3, 6 and 8.

However, Bayer's own News Release, dated November 26, 2007,
announcing the business arrangement directly contradicted the
claims Bayer asserted in this case.  The News Release announced
a "long term collaboration agreement [with MS Tech] to jointly
develop and commercialize several innovative trait technology
products in soybeans."  Docket No. 9-5 (emphasis added).  The
News Release quoted Stine, as the Director of MS Tech,

> "We are excited by the potential benefits this
> collaboration with Bayer CropScience offers to growers
> and the industry", said Harry H. Stine, a Director of
> M.S. Technologies.  "As a result of this
> collaboration, soybean growers will have better
> solutions to optimize productivity and maximize per
> acre profits.  We are pleased to be working with
> Bayer, whose knowledge of herbicide technology and
> worldwide regulatory expertise will help us bring
> these novel products to market."

Id. (emphasis added).  Bayer takes the remarkable position that
the News Release was not inconsistent with the position it took
before Judge Andrews and this Court.  It is.  The News Release
set forth that Bayer and MS Tech had agreed to commercialize the
soybeans.  At a minimum, the 2007 News Release should have put
Bayer on notice in this lawsuit that the commercialization
venture was not with Stine only, as Bayer continued to argue,
but with MS Tech (of which Stine was its director).  This fact
should have prompted an inquiry into the contractual
relationship vis-à-vis MS Tech.  Had Bayer made such inquiry, it

would have learned that the commercialization agreement had to
be with MS Tech so that Stine did not incur liability to
Monsanto.  Contrary to what Bayer told Judge Andrews, it was
Bayer, not Dow, that had a "gross misunderstanding" of the
Bayer-MS Tech-Stine arrangement.

Throughout this litigation, Bayer marched onward with
a view of its case that was not supported by its own
witnesses.  To be clear, if this were a case involving a
colorable dispute regarding contract language, this would
not be an exceptional case.  But this case is not such
case.  Far from it.  The positions Bayer took to support
their contract interpretation arguments were directly
contradicted by the record evidence Bayer had obtained
through early discovery and Bayer should have made every
effort to discover before filing suit.  Bayer's filing of
the motion for preliminary injunction early in this
litigation was frivolous and unnecessarily increased the
costs of litigation.  First, Judge Andrews had already
established filing and discovery deadlines.  Second, and
more importantly, Bayer claimed no further discovery was
necessary to decide the motion.  Such position is
disturbing because at the very same time Bayer made this
representation, the parties were conducting depositions.
As set forth above and in this Court's prior Opinion, such

deposition testimony of Bayer's own witnesses debunked
Bayer's claims.

It is disturbing to this Court that Bayer accuses (and
continues to accuse) Dow of "soiled hands and litigation
misconduct," [Docket No. 335, at 9] (Bayer's Opp. to Dow's
Refiled Motion for Fees and Costs") when there is no evidence to
support such accusation.  Bayer labels Dow's request for fees as
"[l]ong on rhetoric, but short on support."  Id.  Bayer is the
classic pot calling the kettle black.  Bayer claims that it
litigated this case in good faith with conduct that was
reasonably justified in law and fact.  Yet, the facts simply do
not bear this out as set forth above in the Court's prior
Opinion and the Report and Recommendation.

Finally, Bayer seems to suggest that because the tribunal
in Bayer III ruled that Dow breached Bayer's rights to the *pat*
gene vis-à-vis its agreement with MS Tech for the creation of
the E3 product – a fact Dow disputes – the sublicense at issue
here involving the *dmmg* fails by res judicata.  Although the
tribunal's finding was subsequent to this Court's Opinion, Bayer
argues that the Court must consider it.  Bayer seems to be
saying that because Dow has lost as to one of the genes in the
E3 product, it ipso facto fails as to the other two genes,
including the *dmmg* gene here because it is all one infringing
product.  Bayer's approach to this case appears to be: Dow has

eventually lost its ability to sell the E3 product so why should it get fees here?  Relatedly, Bayer proclaims: "[n]o fraud was committed; [n]o misrepresentation to the Court occurred, nor was evidence compromised."  [Bayer's Objections, at 2, n.3].  It is evident to this Court that Bayer fails to appreciate the harm caused by its objectively unreasonable litigation conduct.

In the final analysis, the Court finds Bayer's conduct troubling.  Faced with no evidence to support its tortured interpretation of the Agreement, Bayer has engaged in acrimonious fallacy and obfuscation, which resulted in unnecessary expenditure of legal fees by Dow.  Bayer will now have to pay the price.

2.    Objections to Amount of Award

Bayer additionally objects to any award of fees because Dow's billing records are so "heavily redacted" that it has been denied "due process" in opposing the fee request.  Bayer argued before Judge Schneider that the records were so heavily redacted, that they contained only vague references to activities, such as, "prepare" or "research", without any meaningful context.  [Docket No. 335, at 37].

The billing records run from August 2011 to June 2013. Judge Schneider deducted $95,702.49 from the total award because such fees were expended in connection with Bayer I.  Bayer does not appear to contest this deduction.  Judge Schneider reviewed

28

the unredacted documentation finding such documentation was
adequate.  Bayer, however, contends that it should be permitted
to object to the reasonableness of the amount of the fees
including the nature and extent of the work done by Dow's
counsel, but that it cannot do so with the records being so
heavily redacted.  As an example, Bayer cites to this Court
(Bayer cited no example to Judge Schneider) a February 8, 2013,
example where three timekeepers logged substantially the same
amount of time for what appears to be the same task.  Bayer Obj.
at 8.

    As a general principle, Bayer is entitled to appraise the
reasonableness of the amount of fees requested by Dow including
the nature and extent of the work done by Dow's counsel on
various phases of the case, so that it may present to the court
any legitimate challenges to Dow's claim. See Ideal Electronic
Security Co., Inc. v. International Fidelity Insurance Co., 129
F.3d 143, 151 (D.C. Cir. 1997)("Ideal is entitled to discover
the information it requires to appraise the reasonableness of
the amount of fees requested by IFIC, including the nature and
extent of the work done . . . so that it may present to the
court any legitimate challenges to IFIC's claim."). See also
Nationwide Payment Solutions, LLC v. Plunkett, 831 F. Supp. 2d
337, 338-39 (D. Me. 2011)("the extent that a fee-invoice
claimant wishes a court to review an unredacted version of its

attorneys' billing invoices for the purpose of judging the
reasonableness of its fee request, it must, as a matter of
fundamental fairness, permit its opponent to review the
unredacted version and be heard as to the reasonableness of the
fee request with the benefit of that full and unfettered
review"); Wasniewski v. Grzelak-Johannsen, 549 F. Supp. 2d 965,
975 (N.D. Ohio 2008)("The alternative of *in camera* review of an
unredacted [attorney billing] statement is . . . unattractive
because it interjects an element of *ex parte* review in this
matter and deprives respondent of an opportunity to raise
arguments"); Essex Builders Grp., Inc. v. Amerisure Ins. Co.,
No. 6:04-cv-1838-Orl-22JGG, 2007 U.S. Dist. LEXIS 14458, 2007 WL
700851, at *2 (M.D. Fla. Mar. 1, 2007)(denying fee claimant's
motion to file documents under seal for *in camera* review;
stating, "The Court finds that it would be manifestly unfair to
Amerisure to require it to defend against the sizeable fee award
claimed by Essex without the benefit of the full record upon
which the fees are based.")

   While this Court finds that Bayer could have done more
before Judge Schneider in terms of articulating why it could not
assess the reasonableness of Dow's fees, the Court will hold
further oral argument on and reserve decision on this objection.
(Alternatively, Dow may wish to turn over revised redacted

billing statements in the interim, which may obviate the need
for oral argument).

Finally, Bayer objects to the award on the grounds that the
Report and Recommendation failed to conduct an independent
analysis as to the reasonableness of the hourly rates. Bayer,
however, never challenged the appropriateness and reasonableness
of the rates for Dow's counsel before Judge Schneider. This
Court will not permit Bayer to raise it here. Bayer's argument
that its failure to challenge the rates is connected to the
redacted billing statements is disingenuous. One has nothing to
do with the other.[12]

III. Conclusion

For the reasons set forth above, the Court adopts the
Report and Recommendation granting Dow's Motion for Fees and

---

[12] Even putting Bayer's failure to challenge Dow's rates, this
Court finds the fees are reasonable. Dow negotiated a billing
arrangement whereby counsel for Dow charges less than its
standard hourly rates charged to other clients for work done by
attorneys, paralegals, and other timekeepers; limits timekeepers
to those with valuable and relevant experience; and provides
additional discounts. The average partner billing rates for the
periods July 2012-December 2012 and January 2013-April 2014 fell
between $743.50-$778.75. See D.I. 323 (Bicks Decl.) at Table 7.
Delaware courts have approved rates between $650 and $700,
putting counsel's rates within roughly 10% of the rates approved
for Delaware attorneys with similar experience. See, e.g.,
Glass Co. v. Guardian Indus. Corp., No. CIV. 09-515-SLR, 2013 WL
936451, at *3 (D. Del. Mar. 11, 2013)($690 rates for outside
patent counsel); In re ALHHoldings LLC, No. CIV. 04-1339-SLR,
2010 WL 520632, at *3-4 (D. Del. Feb. 12, 2010) ($675 rates
reasonable); Segen v. OptionsXpress Holdings, Inc., 631
F.Supp.2d 465, 476 (D. Del. 2009)(rates of $700 and $650
reasonable).

Costs as Prevailing Party.  The Court reserves on the amount of the award.


                                    s/Renée Marie Bumb
                                    RENÉE MARIE BUMB
                                    United States District Judge

Dated: March 13, 2015